UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------------X

MICHELLE WILSON

                              Plaintiff,

             -against-

NORTHWESTERN MUTUAL INSURANCE COMPANY,

                              Defendant.

------------------------------------------------------------------------------X

Civil Action No. 07 CV 2790 (CLB)

## THE NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY'S MEMORANDUM OF LAW IN OPPOSITION TO MICHELLE WILSON'S MOTION FOR SUMMARY JUDGMENT

RIVKIN RADLER LLP
926 RexCorp Plaza
Uniondale, New York 11556-0926
(516) 357-3000

Attorneys for Defendant
The Northwestern Mutual Life
Insurance Company

Of Counsel:
Norman L. Tolle

## PRELIMINARY STATEMENT

This Memorandum of Law is respectfully submitted in opposition to Michelle Wilson's ("plaintiff") motion for summary judgment in her action against The Northwestern Mutual Life Insurance Company (incorrectly named as Northwestern Mutual Insurance Company) (hereafter referred to as "Northwestern Mutual").

On or about May 29, 2004, Northwestern Mutual issued two life insurance policies to plaintiff's late husband, Kenneth Wilson ("Mr. Wilson"): Whole Life Policy No. 16,852,083 in the face amount of $150,000 (the "Whole Life Policy") and Term Life Policy No. 16,852,105 in the face amount of $350,000 (the "Term Life Policy") (collectively the "Policies"). Both Policies lapsed as of February 28, 2005.

On or about June 6, 2005, Mr. Wilson died, and plaintiff subsequently demanded payment under the Policies. Following Northwestern Mutual's denial of her claim, plaintiff initiated the instant action (the "Complaint") seeking the proceeds of the Policies and alleging untimely notification of denial, misleading and deceptive practices, violation of New York State's General Obligation Law and Insurance Law, and "negligence, carelessness and/or recklessness." In accordance with the Order issued by Judge Charles L. Brieant, Northwestern Mutual moved on January 31, 2008 for summary judgment dismissing plaintiff's Complaint in its entirety, and plaintiff now moves for summary judgment "holding her entitled to payment of the Policies as a matter of law." For the reasons detailed below, the Court should deny plaintiff's motion in its entirety.

1

## ARGUMENT ✓

### I.   PLAINTIFF'S MOTION IS PROCEDURALLY DEFECTIVE

Federal Rule of Civil Procedure 56 provides that:

> A supporting or opposing affidavit must be made
> on personal knowledge, set out facts that would be
> admissible in evidence, and show that the affiant
> is competent to testify on the matters stated.  If a
> paper or part of a paper is referred to in an affidavit,
> a sworn or certified copy must be attached to or
> served with the affidavit.

F.R.C.P. 56(e).

The corresponding local civil rule for the Southern and Eastern Districts, Rule 56.1,

provides that:

> Upon any motion for summary judgment pursuant
> to Rule 56 of the Federal Rules of Civil Procedure,
> there shall be annexed to the notice of motion a
> separate, short and concise statement, in numbered
> paragraphs, of the material facts as to which the
> moving party contends there is no genuine issue
> to be tried.  **Failure to submit such a statement
> may constitute grounds for denial of the motion.**

Local Rule 56.1(a) (emphasis added).  *See, also,* Aligheri v. Long Island Railroad et al., 1994

U.S. Dist. LEXIS 8769 at *11 (S.D.N.Y.  June 29 (1994) ("The failure of the moving party to

submit a Rule 3(g) [predecessor to rule 56.1] statement annexed to the notice of motion is thus

grounds for denial of the motion"); United States of America v. Pilot Petroleum Associates, Inc.,

1988 U.S. Dist. LEXIS 12344 at *2 (E.D.N.Y. Oct. 19, 1988)("The plain language of the rule

provides that the failure of the moving party to submit a Rule 3(g) statement is grounds for

denying the motion").

The Second Circuit, in Laura Holtz v. Rockefeller & Co., Inc., 258 F. 3d 62, 73 (2d Cir.

2001)(internal citations omitted), explained that "[t]he purpose of Local Rule 56.1 is to

streamline the consideration of summary judgment motions by freeing district courts from the

2

need to hunt through voluminous records without guidance from the parties." Similarly the

district courts have repeatedly held that: "[t]he purpose of the Local 56.1 statement is to assist

the court in determining which facts are genuinely disputed" (Madison Maidens, Inc. v.

American Manufacturers Mutual Ins. Co., 2006 U.S. Dist. LEXIS 39633(S.D.N.Y. June 15,

2006) (internal citations omitted)) and that:

> Plaintiffs' failure to file a Statement of Undisputed Facts is not
> only a procedural error, but it is a substantive one as well.
> Without a Statement of Undisputed Facts and a response thereto,
> this Court cannot determine whether any material issues of fact
> exist, as required by Rule 56 of the Federal Rules of Civil Procedure.

Steinbach v. Brookman, et al., 2006 U. S. Dist. LEXIS 90327 (W.D.N.Y. Dec. 16, 2006)

(holding that plaintiffs had failed to satisfy their burden of demonstrating that there are no

material facts at issue). Thus, the Magistrate Judge, in Santiago v. Duarte et al., 2000 U.S. Dist.

LEXIS 2143 at * 5 (S.D.N.Y. Feb. 24, 2000), found that defendants' failure to comply with

Local Civil Rule 56.1 "constitutes grounds for denial of their motion" and recommended that the

motion be so denied, and the court in Harbor Seafood, Inc. v. June Foods Holding Corp., 1988

U.S. Dist. LEXIS 6518 (E.D.N.Y. May 24, 1988) denied plaintiff's motion for summary

judgment because it failed to submit the required statement of material facts.

Furthermore, in those instances where the courts have elected to be flexible in construing

Rule 56.1, it was only because "other materials, such as affidavits, depositions and documentary

evidence, [had been] submitted in connection with the motion" (Koal Indus. Corp. v. Asland,

S.A., 808 F. Supp. 1143, 1152 (S.D.N.Y. 1992) or because the plaintiff's counsel's affirmation

contained a detailed recitation of uncontested facts (Wasserman v. The City of New York, 802 F.

Supp. 849, 858 (E.D.N.Y. 1992) or because the moving party was acting *pro se* (Williams v.

Potter, 2007 U.S. Dist. LEXIS 60230 (S.D.N.Y. Aug. 14, 2007). In the case at hand, plaintiff

*Lisa,*
*Check with Anita – I seem to recall that a deposition*
*transcript was one of plaintiff's exhibits.*

has failed to provide the required Rule 56.1 Statement of Material Facts, and none of the possible
ameliorating factors cited above are present. Plaintiff is obviously not *pro se*, and her counsel's
affirmation, consisting of only two paragraphs, does not serve to either admit any documents into
the record or meet the requirements of F.R.C.P. 56 to "set out facts that would be admissible in
evidence, and show that the affiant is competent to testify on the matters stated." Additionally,
there are no other affidavits or depositions attached to the motion, and plaintiff's voluminous set
of exhibits is not authenticated. Accordingly, this court should deny plaintiff's motion for
failure to comply with the Federal and Local Rules, or, at a minimum, strike plaintiff's exhibits
since they have not been properly authenticated or admitted.

In addition to her failure to comply with the Federal and Local Rules, plaintiff has also
failed to comply with Judge Brieant's individual rules. The Individual Practices of Judge
Charles L. Brieant at Paragraph 2, Section C states quite clearly that "[m]emoranda of law in
support of and in opposition to motions should be limited to **25 pages**, and reply memoranda
should be limited to 10 pages" (emphasis added). While Northwestern Mutual adhered to this
requirement in its moving papers, plaintiff's "Memorandum of Law in Support of Fed. Rule
56(C) Motion for Summary Judgment" (hereafter referred to as "Plaintiff's ~~Brief~~ *Memorandum*") ignored the
requirement by exceeding the allowable page limit by nine pages. ~~Although any penalty to be
assessed for this violation is subject to the Court's discretion, the result has been prejudice to
Northwestern Mutual~~.

II.    **PLAINTIFF'S MOTION IS ~~SUBSTANTIALLY~~ *Substantively* DEFECTIVE**

Plaintiff's ~~Brief~~ *Memorandum* states that plaintiff seeks "summary judgment holding her entitled to
payment of the Policies as a matter of law pursuant to Fed. R. Civ. P 56 (c)." (Plaintiff's

4

Memorandum
~~Brief~~ at page 1.) On the basis of this statement, as well as plaintiff's failure to address any

of the other causes of action alleged in her Amended Complaint (Exhibit 5 to Plaintiff's

Memorandum
~~Brief~~), it must be assumed that plaintiff is seeking summary judgment only on her breach of

contract claim, and has chosen not to pursue any of her other causes of action against

Northwestern Mutual. However, as will be demonstrated below, plaintiff is not entitled to

summary judgment granting her payment under the Policies because both Policies lapsed

more than three months prior to the insured's death.

.

### A.    The Whole Life Policy Terminated Effective February 28, 2005

Memorandum
Significantly, plaintiff only devotes two and one-half pages of her thirty-four page ~~Brief~~

to argue that she is entitled to the proceeds of the Whole Life Policy. Apparently, even she

realizes that her position in regard to this Policy is so meritless as to not warrant any additional

time or space.

Plaintiff does not dispute the fact that the Whole Life Policy terminated effective

February 28, 2005. ~~See Affidavit of Paulette Getschman, Assistant Director in Northwestern~~

's                                                 position
~~Mutual's Policyowner Services Department.~~ Instead, plaintiff ~~bases her entire argument~~ with
                                                   is based upon An contention that
regard to the Whole Life Policy ~~solely on whether or not~~ the requirements of Insurance Law §

3211(a)(1) apply. Insurance Law §3211(a)(1) provides:

> No policy of life insurance or non-cancellable disability
> insurance delivered or issued for delivery in this state, and
> no life insurance certificate delivered or issued for delivery
> in this state by a fraternal benefit society, shall terminate or
> lapse by reason of default in payment of any premium,
> installment, or interest on any policy loan in less than one
> year after such default, unless a notice shall have been duly
> mailed at least fifteen and not more than forty-five days prior
> to the day when such payment becomes due. A separate notice
> shall not be required for insurance that is supplemental to a

5

policy of life insurance.

However, as plaintiff acknowledges, this notice requirement does not apply where premium payments are made on a monthly, or shorter, basis. See, Plaintiff's ~~Brief~~ Memorandum at page 32.

Insurance Law § 3211.(f) explicitly states that: "[t]his section shall not apply to:

                                        ***

> (2) Any policy of insurance requiring the payment of premiums
> monthly or at shorter intervals, provided in the case of policies of
> life insurance the insurer issuing such policy elects with respect to
> all such policies to mail a written notice within six months after
> termination or lapse to the insured or to any other person who shall
> have been designated in writing to receive such notice, stating the
> type and amount of any automatic nonforfeiture benefit in force.

Plaintiff's convoluted ~~and confusing~~ contention is that, although Mr. Wilson had clearly elected to ~~make~~ pay his premiums on a monthly basis (see ISA form, included as part of Exhibit "8" to Plaintiff's Motion and annexed as Exhibit "L" to the January 25, 2008 Affidavit of Cylvia Prince), "it also appears that the actual payments were indeed billed by the company for payment on a quarterly basis," (Plaintiff's ~~Brief~~ Memorandum at page 32), thereby triggering the notice requirements of § 3211(a)(1). However, in support of her claim that the payments were billed on a quarterly basis, plaintiff cites to only section 4.1 of the Whole Life Policy which reads:

> Premiums may be paid every 3, 6 or 12 months at the
> published rates of the Company. A change in premium
> frequency will take effect when the Company accepts
> a premium on a new frequency. Premiums may be
> paid on any other frequency approved by the Company.

Section 4.1 does not establish that Mr. Wilson paid his premiums quarterly. On the contrary, it clearly states that "[p]remiums may be paid on any other frequency approved by the Company" and the ISA form establishes that Northwestern Mutual approved the monthly ✓ payment ~~schedule~~ frequency for Mr. Wilson ~~(see ISA form)~~. Plaintiff cites to no ~~document or conversation~~ evidence

6

*Mutual*

in which either Mr. Wilson or Northwestern altered this monthly billing pattern. Accordingly, there can be no question that the § 3211(f)(2) exception applies here.

The Appellate Courts in each department of New York State have held that where, as here, the insured elected to make monthly premium payments, the § 3211(f)(2) exception applies, and the insurer is not obligated to comply with the notice requirement of § 3211(a)(1). See, McGarr v. The Guardian Life Insurance Company of America, et al., 19 A.D.3d 254, 256 (1st Department 2005)("since premiums were paid on a monthly basis, section 3211(a)(1) does not apply..."); Gerold v. Companion Life Insurance Company, 819 N.Y.S. 2d 276, 278 (2d Dep't 2006) ("the defendant was not required to notify the plaintiff that the policy lapsed because the insured elected to pay the premiums on a monthly basis"); Elston v. Allstate Life Insurance Company of New York (274 A.D. 2d 938, 939(3rd Dep't 2000) ("Once the monthly automatic payment option for premiums was chosen, the language of Insurance Law § 3211 was ✓ triggered, thus obviating the requirement that defendant provide written notification of cancellation prior to its termination of the policy"); Reczek v. National Benefit Life Ins. Co., 20 A.D. 3d 887, 888 (4th Dep't 2005)("It is undisputed that decedent had elected to pay the premiums on a monthly basis. Having made that election, decedent thereafter was required to make monthly payments and the notice requirement of section 3211(a)(1) was rendered inapplicable").

All of the above cases involve fact patterns parallel to that in the case at hand. In each, the insured had elected to make monthly premium payments on his life insurance policy, the policy lapsed for nonpayment, the grace period passed, the insured died, and the beneficiary or executor then sued for the policy's proceeds, arguing that the insurer had failed to provide the notice required by § 3211(a)(1). In each case, the court found in favor of the insurer, holding

7

that §3211(a)(1) did not apply, that there were no triable issues, and that the insurer was not

estopped from asserting the policy's lapse as of the premium due date. In Reczek, the court

additionally held that "[b]ecause no notice was required, the notice that was allegedly sent by

defendant during the grace period was a 'gratuitous, 'friendly reminder'' that did not

retroactively convert the policy to one requiring notice under section 3211 (a)(1) ." Reczek at

888 (quoting Brecher v. Mutual Life Ins. Co. of N.Y., 120 A.D. 2d 423 (1986).

Here, as well, Mr. Wilson's election of the monthly payment option relieved

Northwestern Mutual of the notice responsibilities of § 3211(a)(1). ~~Accordingly, the April 8,~~

~~2005 "Urgent Billing Notice," which stated that the payments due on February 22 and on March~~

~~22 had not been made and that "Immediate payment is needed- Individual policies may already~~

~~be beyond their grace period," was merely a "gratuitous friendly reminder" that neither changed~~

~~the payment option elected by Mr. Wilson nor imposed any additional obligations on~~

~~Northwestern Mutual.~~   Since Northwestern Mutual was not subject to the notice requirements of

§3211(a)(1), plaintiff has ~~absolutely~~ no basis for claiming entitlement to the proceeds of the

Whole Life Policy and her motion ~~in this regard~~ with respect to this policy must be denied.

### B.    The Term Life Policy Terminated Effective February 28, 2005

#### 1.    There Was No Oral Agreement to Modify the Written Terms of the Term Life Policy.

Plaintiff argues that she is entitled to the proceeds of the Term Life Policy because "the

law [New York General Obligation Law § 15-301 and New York Insurance Law § 3204] does

not allow-provide for the enforcement of oral modifications to the written terms of a life

insurance policy" (Plaintiff's ~~Brief~~ Memorandum at page 11).   While it is true that verbal agreements to change

the written terms of a contract are generally impermissible, this argument has no relevance here

because there were no oral modifications to the written terms of the Term Life Policy. Although

8

plaintiff alleges that there was "a claimed oral agreement with Mr. Wilson to modify the Policy terms related to the Policy's express grace period of 31 days..." and "an agreement for a change in premium due date" (Plaintiff's ~~Brief~~ Memorandum at page 11), she fails to show in what way(s) the Policy's terms relating to either the grace period or the premium due dates were altered. Accordingly, there is no basis to plaintiff's argument and it must be rejected.

The provisions of the Term Life Policy which relate to the premium due date and the grace period state as follows:

> 3.2    Premium Payment
> All premiums after the first are payable at the Home Office or to an authorized agent. A receipt signed by an officer of the Company will be furnished on request. A premium must be paid on or before its due date. The date when each premium is due and the number of years for which premiums are payable are described on page 3.
>
> 3.3    Frequency
> Premiums may be paid every 3, 6 or 12 months at the published rates of the Company. A change in premium frequency will take effect when the Company accepts a premium on a new frequency. Premiums may be paid on any other frequency approved by the Company. ~~[Note: The ISA agreement signed by Mr. Wilson changed the payment frequency to "Monthly."]~~
>
> 3.4    Grace Period
> A grace period of 31 days will be allowed to pay a premium that is not paid on its due date. The policy will be in full force during this period. If the insured dies during the grace period, any overdue premium will be paid from the proceeds of the policy.
>
> **If the premium is not paid within the grace period, the policy will terminate as of the due date.** (emphasis added)

On May 23, 2005, Mr. Wilson telephoned Northwestern Mutual to inquire why there was a $35 shortage in his ISA (Insurance Service Account), the account through which the

Policies' premiums were paid. When it was explained to him that he had incurred a $35 charge since his earlier termination of the Whole Life Policy meant that he no longer owned multiple Northwestern Mutual polices, Mr. Wilson requested that the Term Life Policy premium payment he had made for the ten-month period covering March through December 2005 be refunded, and that the Policy be allowed to lapse. As the result of Northwestern Mutual's compliance with this request. the last paid premium for the Term Policy was for the period ending February 28, 2005. Therefore, as per the Policy provisions, the 31-day grace period expired March 31, 2005 and the Term Life Policy lapsed as of February 28, 2005. This transaction involved neither a "change in premium due date" nor a modification of the "grace period of 31 days" and therefore did not violate either the General Obligation Law or the Insurance Law.[1]

2. Northwestern Mutual's Business Records Constitute Admissible, Authenticated Evidence that Mr. Wilson Elected to Terminate the Term Life Policy

Although plaintiff acknowledges that Federal Rule of Evidence ("FRE") 803 (6) permits ✓ the admission of business records under certain specified conditions, she contends that Northwestern Mutual's July 26, 2005 letter is not admissible because it "was not made in the regular course of business at or about the time of the event and by a person with personal knowledge." (Plaintiff's Memorandum at page 20). Northwestern Mutual has, however. never indicated that it intended to introduce the July 26, 2005 letter as a business record. Nevertheless, plaintiff then attempts to piggyback the identical argument as a means of discrediting, across the board, all of Northwestern Mutual's Discovery Responses. In this regard, however, her argument must fail as a matter of law since many of the Discovery Responses, specifically those documents

---

[1] Since plaintiff's Complaint alleges violation only of General Obligation Law § 15-301 and Insurance Law § 4226, the arguments she makes in her motion papers relating to Insurance Law § 3204 and General Obligations Law § 5-701 must be disregarded by the Court.

10

which Northwestern Mutual does seek to admit as evidence, indeed meet the requirements of
FRE 803 (6).

In interpreting FRE 803 (6), the Second Circuit has consistently held that "Rule 803(6)
'favors the admission of evidence rather than its exclusion if it has any probative value at all,' In
re Ollag Constr. Equip. Corp., 665 F.2d 43, 46 (2d Cir. 1981) (quotation omitted), and the
'principal precondition' to admissibility 'is that the record[] [has] sufficient indicia of
trustworthiness to be considered reliable.' Saks Int'l v. M/V "EXPORT CHAMPION, 817 F.2d
1011, 1013 (2d Cir. 1987)" Phoenix Assocs. III v. Stone, 60 F.3d 95, 101 (2d Cir. 1995).
Similarly, with respect to the requirements set out in Federal Rule of Evidence 901(a) for the
authentication of records, the Second Circuit has also observed that "Rule 901 does not erect a
particularly high hurdle, and the proponent of the evidence is not required to rule out all
possibilities inconsistent with authenticity, or prove beyond any doubt that the evidence is what
it purports to be."(United States v. Dhinsa, 243 F. 3d 635, 658 (2d Cir. 2001) (internal citations
omitted)); and that "Rule 901's requirements are satisfied if sufficient proof has been introduced
so that a reasonable juror could find in favor of authenticity or identification". United States v.
Tin Yat Chin, 371 F. 3d 31, 38 (2d Cir. 2004)(internal citations omitted)

Searles v. First Fortis Life Ins. Co., 98 F. Supp. 2d 456 (S.D.N.Y. 2000), is directly on
point. In Searles, Wendy Wagoner, a benefits specialist for Fortis, stated in her affidavit that she
had personal knowledge of the facts relating to plaintiff's claim for disability benefits because
she had personally investigated and evaluated that claim and had reviewed the related
administrative records. The Court found Ms. Wagoner competent to testify and to introduce the
relevant documents into the record, and held that her testimony did not contain inadmissible
hearsay. Because "each statement in her affidavit that references conversations with others is

11

supported by citations to the administrative record, in which Ms. Wagoner documented her various conversations in what appears to have been the course of Fortis' regular business practice," the Court held that "[s]uch statements are therefore admissible under the business records exception to the hearsay rule and, as the custodian of the records, Ms. Wagoner is a competent witness through whom they could be admitted at trial." Id. at 462.

In other Second Circuit cases, the courts have held that the case notes made by a social worker in the regular course of business were admissible under the business records exception to the hearsay rule (Malek v. Federal Ins. Co., 994 F. 2d 49, 53 (2d. Cir. 1993)), as were medical records that were on the medical corporation's letterhead and contained notes which appeared to have been written by the corporation's medical director and physician (Kamara v. United States, 2005 U.S. Dist. LEXIS 20651 (S.D.N.Y. Sept. 20, 2005). Although decided under State Law, the case of Trotti et al. v. Estate of Lynn P. Buchanan, 272 A.D. 2d 660 (3rd Dep't 2000) is especially instructive here since the defendants attempted to invoke the protection of the Dead Man's Statute in connection with the introduction of business records. The defendants claimed that plaintiff's son could not authenticate the business receipts documenting the decedent's debts to his mother's store because he was an 'interested" person. The court, however, held that he could not "be said to be a 'person interested in the event,'" and it, therefore, accepted his testimony that these records were kept "regularly, systematically, routinely and contemporaneously." Id at 661. The court additionally held that the store owner's own "testimony concerning the authentication of her business records consisted of her description of the manner and method of recording store credit transactions, an independent act which cannot be considered testimony 'concerning a personal transaction or communication' with decedent." Id at 662 (internal citations omitted).

12

In a similar manner, the records made by Northwestern Mutual employees memorializing and documenting their telephone conversations and other interactions with Mr. Wilson, Mr. Stein and each other are indisputably admissible under the business records exception to the federal hearsay rules, and the affidavits of those individuals are sufficient to establish the records' authenticity. Thus, the May 23, 2005 telephone conversations between Mr. Wilson and Diane Knueppel, a Senior Customer Service Representative at the time, in which Mr. Wilson instructed Ms. Knueppel to refund the last draft for the Term Life Policy and let the Term Life Policy lapse as of February 28, 2005, are admissible since, as plaintiff herself explains, they were memorialized, in accordance with Northwestern Mutual's usual business practice, on Northwestern Mutual's Casetracker system "at or about the time of the event and by a person with personal knowledge." (Plaintiff's ~~Brief~~ Memorandum at page 20). See, Affidavit of Diane Knueppel and its accompanying exhibits. Similarly, the notes of Ms. Knueppel's conversation with Mr. Stein, her request to Joyce Barrack (a Senior Analyst in Northwestern Mutual's Policyowner Services Department) to "refund premiums back to Feb 2005," and her notes regarding "refund sent via SAMS to client for premiums paid back to Feb 2005" are likewise admissible since they too were documented, as per Northwestern Mutual's usual business practice "at or about the time of the event and by a person with personal knowledge." Also admissible are the notes made on the Casetracker System by Ms. Barrack (see Affidavit of Joyce Barrack), and the documents generated ~~by Cylvia Prince, a Northwestern Mutual Research Specialist~~ from Northwestern Mutual's financial history records (see Affidavit of Cylvia Prince). ∠ by Cylvia Prince, a Northwestern Mutual Research Specialist.

Moreover, plaintiff, in her transparent effort to have Northwestern Mutual's discovery responses rejected, makes several blatant misrepresentations ~~that need to be clarified for the record.~~ For example, in an attempt to insinuate that Mr. Wilson did not know of the $35 fee

13

prior to his death, and therefore could not have made the telephone call documented in

Northwestern Mutual's records, plaintiff states that "[a]ccording to the notes, the shortage should

not have been 'charged until the policy lapsed, after May 29, 2005. [See Exhibit "NML 274.]"

See, Plaintiff's ~~Brief~~ Memorandum at page 21. Although plaintiff includes opening quote marks in her alleged

✓quotation, she ~~deliberately~~ omits closing quote marks, thereby giving the impression that the quotation

~~quote~~ included the date, May 29, 2005. However, a review of the cited document shows that, in

reality, the note entered on Northwestern Mutual's Casetracker system read:

> "Spoke with client, informed him that the $35 is a policy fee
> that was previously waived due to the companion status on this
> policy. Once his ACL [the Whole Life] policy lapsed this policy
> [the Term Life Policy] is no longer a companion policy so the
> fee is no longer waived. Client indicated that the amount quoted
> to pay the ISA to December included this fee. Explained that the
> **fee would not have charged until the policy [the Whole Life
> Policy] lapsed,** therefore the amount quoted to reactivate the ISA
> did not include the policy fee.
> Client is now asking to be refund[ed] his last payment and let
> the policy lapse. Negotiated call back so I may contact FR
> [Field Representative Daniel Stein] to discuss."

NML 274 (copy annexed as      )

Accordingly, ~~it is unquestionable that~~ it is clear that despite plaintiff's efforts to play fast and loose

with the facts ~~and mislead the Court~~, the $35 fee was generated after the Whole Life Policy

terminated, and ~~not after~~ that the May 29, 2005. date was not part of the casetracker note. Moreover, ~~the records~~ Northwestern Mutual's insurance records document that the premium

adjustment of $35 was made on May 9, 2005, resulting in the negative balance that precipitated

Mr. Wilson's May 23, 2005 telephone call. See Affidavit of Cylvia Prince at ¶ 24 and the

accompanying exhibit. Since more than two weeks passed between the generation of the

negative balance and Mr. Wilson's telephone call, he had more than enough time to learn of the

shortage, and plaintiff's attempts to paint a different picture must fail. ~~Moreover, her accusation~~ Finally, plaintiff's contention

that "Northwestern representative who it is claimed had the conversation with Mr. Wilson is the

14

surprised that a shortage existed in his ISA Account," (Plaintiff's ~~Brief~~ *Memorandum* at page 21) is not ~~documented~~ *supported* by the record (see NML 274), and, in fact, ~~has absolutely no basis~~ *is a complete fiction.* *fiction.*

✓  Plaintiff also ~~attempts to~~ mislead*s* the court by stating that "[a]fter the conclusion of Discovery Defendant's Counsel provided form 18-1680 (2004), a form used for policy cancellation, together with the admission that the form was not provided to Mr. Wilson as was the usual practice of Northwestern" and she cites to her Exhibit 12. (Plaintiff's ~~Brief~~ *Memorandum* at page 3) However, even a cursory glance at plaintiff's Exhibit 12 reveals that plaintiff has not only omitted the second page of Northwestern Mutual's counsel's December 19, 2007 letter, but has also completely misrepresented the contents of the letter. Contrary to her assertion, the letter contains no "admission," but, rather explains quite explicitly that the form "would not have been used with respect to Mr. Wilson's request to terminate his term life insurance policy, since he not only requested a cancellation of the policy, but also requested a refund of premiums effective some three months earlier than the date he requested cancellation. Therefore, the enclosed policy form which provides that cancellation will be effective at the end of the insurance period for which premiums have been paid, unless an earlier date is required by contractual terms or state regulation, is not applicable to Mr. Wilson's situation." ~~A complete copy of the December 19, 2007 letter is annexed as~~  .

Accordingly, despite plaintiff's deliberate efforts to obfuscate the record, it is clear that Northwestern Mutual's business records meet the requirements of the Federal Rules of Evidence, and are admissible to establish that Mr. Wilson ~~consciously chose to~~ *requested that Northwestern terminate* terminate the Term Life Policy effective February 28, 2005.

15

### 3. The "Dead Man's Statute" Does Not Preclude Testimony Regarding Conversations between Northwestern Mutual employees and Mr. Wilson

Although FRE 601 generally governs the competency of potential witnesses in federal cases, New York C.P.L.R. § 4519 (the so called "Dead Man's Statute") must be applied here because FRE 601 provides that: "[i]n civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the competency of a witness shall be determined in accordance with State Law." Sun Life Assur. Co. v. Deborah Ann Gruber, 2007 U.S. Dist. LEXIS 92141 at *47, n. 56 (S.D.N.Y. Dec. 14, 2007) (*citing* Rosenfeld v. Basquiat, 78 F. 3d 84, 88 (2d Cir. 1996) and H. R. Rep. No. 650, 93rd Cong., 1st. Sess. 9 (1973) (noting that FRE 601 was amended to require the application of state competency rules to avoid "rendering inapplicable in the federal courts the so-called Dead Man's statutes").

"CPLR 4519 disqualifies parties interested in litigation from testifying about personal transactions or communications with deceased or mentally ill persons" (Poslock v. Teachers' Retirement Bd., 88 N.Y. 2d 146, 150 (N.Y. 1996) (*citing* **Prince, Richardson on Evidence** § 6-121) in order to "'protect the estate of the deceased from claims of the living who, through their own perjury, could make factual assertions which the decedent could not refute in court'" (Poslock, *quoting* Matter of Wood, 52 NY2d 139, 144 (1981)). However, not only is the operable term "parties **interested** in litigation," but a number of exceptions to this rule have also been carved out by the courts of ~~this state~~ New York.

There has been considerable controversy surrounding the "Dead Man's Statutes" enacted by many states, and a large body of case law analyzing and interpreting such statutes has evolved. For the purposes of the matter at hand, the most important New York ruling is that by the Court of Appeals in Ward v. New York Life Ins. Co., 225 NY 314 (N.Y. 1919) which created a narrow exception for testimony relating to life insurance policies. As pointed out by the Court

16

of Appeals in 1996, "Ward itself, decided in 1919, has stood the test of time, common-law

developments and legislative change... " Poslock, *supra*, at 152.

> In *Ward*, this Court narrowly bypassed the predecessor statutory prohibition
> (*see*, former Code Civ Pro § 829). The linchpin of the Court's holding was
> the language in former Code of Civil Procedure § 829 (now CPLR § 4519),
> that the statute only applied when the persons against whom the testimony
> was being offered "derived their 'title or interest from, through or under a
> deceased person' " ( *Ward v New York Life Ins. Co.. supra*, at 319, quoting
> former Code Civ Pro § 829). To solve the dilemma there, the Court
> examined the nature of those life insurance proceeds. It determined that
> they did not come "from, through or under" the deceased person, because
> "[t]he great body of authority makes it plain ... that when section 829
> speaks of deriving title or interest from, through or under a deceased person
> it contemplates property or an interest *which belonged to the deceased in
> his lifetime* and the title to which has passed by assignment or otherwise
> through him to the party who is protected by the section" ( *id.,* at 319-320
> [emphasis added]). The proceeds of a life insurance policy, the Court
> declared, "never belonged to the deceased and ... did not come into
> existence until his death" ( *id.,* at 320).

Poslock at 151-152. *See, also*, 81 **Am. Jur**. 2d Witnesses § 658 ("The beneficiary in a life

insurance policy or benefit certificate is not protected by a dead man's statute when sued by one

seeking to recover the proceeds or impress a trust upon them, or when made a party to an

interpleader action by the insurer or benefit society, as no right of the deceased passed to the

beneficiary and any interest he or she may have came into existence upon the death of the

insured as an original obligation").

As a result of thus interpreting the Dead Man's Statute, the Court of Appeals in Ward

held that the wife's testimony concerning her deceased husband's change of life insurance

beneficiary should have been admissible in the interpleader action commenced by the insurance

company. Similarly, the Southern District, in New York Life Ins. Co. v. Cross, 7 F. Supp. 130,

131 (S.D.N.Y. 1934), relying on Ward, held that "under the construction of section 347 of the

Civil Practice Act by the New York Court of Appeals, which, of course, controls me, on the

competency of witnesses the testimony [of one of three claimants to the proceeds of a life insurance policy] is admissible, for the reason that under the decision in that case the other respondents are not persons who derived their title or interest "from, through or under a deceased person * * * by assignment or otherwise.").

Thus, the Court of Appeal's decision in Ward is a binding "exception to the general statutory principle" (Poslock at 152) which indisputably allows the admission of testimony by Northwestern employees *in which they relate their* conversations with Mr. Wilson. However, even without the Ward exception, the Dead Man's Statute would not apply here because an insurance company employee is clearly not "a person interested in the event."

The following standard has been set forth by the courts for evaluating whether a potential witness is "interested" for purposes of invoking the Dead Man's Statute:

> The true test of the interest of a witness is that he will either gain or lose by the direct legal operation and effect of the judgment, or that the record will be legal evidence for or against him in some other action. It must be a present, certain and vested interest, and not an interest uncertain, remote or contingent.

In re Estate of Rosenblum, 284 A.D.2d 820, 821 (3rd Dep't 2001), *appeal denied*, 97 N.Y.2d 604 (2001) (*quoting* Friedrich v. Martin, 294 N.Y. 588, 595 (N.Y. 1945) *quoting* 1 Greenleaf on Evidence, section 390.)). *See also*, Stay v. Horvath, 177 A.D.2d 897, 899 (3rd Dep't 1991) (internal citations omitted)("We note initially that the party claiming that a witness is a person "interested in the event" (CPLR 4519) carries the burden of proving that the witness's testimony is subject to this statutory exclusion"); Duncan v. Clarke, 308 N.Y. 282, 285 (N.Y. 1955) ("the 'interest' which renders a witness incompetent under section 347 [now 4519] is only such as results from the 'direct legal operation of the judgment'"); Croker v. New York Trust Co., 245 N.Y. 17, 22 (N.Y. 1927) (*quoting* Albany Co. Sav. Bank v. McCarty, 149 N.Y. 71, 84 (1896))

18

("An interest in the question is not enough to disqualify as that is not an interest in the event. 'Unless the witness will gain or lose by the event, either directly, as in money, or indirectly, because the record could be used as evidence for or against him, he is not disqualified.' A witness might be biased. He might be solicitous for the success of the party for whom he testified or he might feel a deep interest in the result of a trial. His credibility might be thereby affected but he was not disqualified for interest.")

Thus, for instance, the court in Stay v. Horvath, *supra*, held that, with regard to a witness who had a money judgment against the plaintiff, "[i]nasmuch as defendants have not proved that Morrell's interest is "'present, certain, and vested' " as opposed to " 'uncertain, remote or contingent' " (Friedrich v Martin, supra, at 595), it was error to exclude his testimony as to any transaction or communication with Sturges (see, Croker v. New York Trust Co., 245 NY 17, 22)" Id. at 899.  Similarly, in Trotti et al v. Estate of Lynn P. Buchanan, *supra*, the court held that testimony by the son of the store owner to whom the deceased was indebted did not violate CPLR § 4519, and in Matter of Stacer v Newman et al., 13 A.d. 2d 164 (4th Dep't 1961 (*quoting* Matter of Behan, 159 Misc. 337, 339 Surr. Ct. Kings Cty 1936), the attorney who was named as executor in one of the wills executed by the deceased was allowed to testify on the basis that "'a testamentary fiduciary has no such interest in the event, by reason of a prospective potential right to commissions, as to render him an incompetent witness under section 347 of the Civil Practice Act.'" Along similar lines, the Surrogates Court of Orleans County allowed a wife to testify concerning a multi-million dollar transaction between the deceased and her husband although she clearly had a potential financial interest in the outcome of the case.  In re Freeman's Will, 23 Misc. 2d 846 (Sur. Ct. Orleans Cty 1960).

19

The Northwestern Mutual employee who spoke to Mr. Wilson clearly will neither gain nor lose personally by the outcome of this case, and therefore cannot be deemed to have an interest in the outcome of this litigation "present, certain, and vested" such that her testimony would be barred by the Dead Man's Statute. As demonstrated by the cases cited above, since the courts have permitted individuals with significantly more direct interest in the outcome of their respective cases to testify, there is no absolutely no basis for invoking the Dead Man's statute here. Accordingly, Ms. Knueppel's testimony ~~that~~ *concerning her conversations with* Mr. Wilson ~~directed her to let the Term Life Policy lapse as of February 28, 2005~~ must be admitted.

There is one additional exception to the Dead Man's Statute that should also be noted. Where CPLR § 4519 has been invoked in connection with motion practice, the courts have held that, even if the evidence in question is subject to exclusion at trial pursuant to the Statute, it may be considered for purposes of defeating summary judgment. *See, e.g.,* In re Estate of Lockwood, 234 A.D.2d 782 (N.Y. App. Div. 1996) (*citing* Matter of Alden, 52 AD2d 1051 (4th Dep't 1976) ("In general, evidence excludable under the statute at trial may still be considered so as to defeat a summary judgment motion"). Accordingly, even if this court were inclined to exclude Ms. Knueppel's testimony at trial, it must still be permitted in connection with Northwestern Mutual's opposition to plaintiff's summary judgment motion.

    4.  Neither Mr. Wilson's Failure to ~~Cash~~ *Deposit* the ~~Policy~~ Refund Check Nor The Mailing of Northwestern's May 23, 2005 Notice Serve to Refute the Fact That the Term Life Policy Terminated Effective February 28, 2005

As a last-ditch effort to salvage her case, Points IV and V of Plaintiff's ~~brief~~ *Plaintiff's Memorandum* present a series of rambling contract law arguments that are neither relevant nor appropriate to the instant

20

case, and which do not alter the indisputable fact that the Term Life Policy terminated, at Mr.
Wilson's direct request, effective February 28, 2005.

Plaintiff contends that plaintiff's failure to ~~cash~~ *deposit* the second refund check serves to revoke
Northwestern's *Mutual's* "offer to backdate and terminate-cancel the Policy." This argument simply has
no basis in either fact or law. First, Northwestern Mutual did not make an "offer" to plaintiff;
rather it was plaintiff who initiated the telephone call and made a request to Northwestern
Mutual. Secondly, the telephone conversation between Ms. Knueppel and Mr. Wilson was not a
negotiation to enter into a contract; rather it was a request to terminate the existing contract
between the parties. As such, it did not need to be in writing[2] and no consideration was required.
Thus, neither the cited treatises nor the cited cases have any applicability, and this argument
must be ~~disregarded~~. *rejected.*

Similarly without merit is plaintiff's argument that Northwestern Mutual's May 23, 2005
notice "must be considered an extension-offering to exercise Mr. Wilson's option to keep the
policy." (Plaintiff's Brief at page 29). In support of her contention that "[n]otices relative to the
terms-offerings of a policy are considered an extension of the policy...," plaintiff cites to a single
case, Buchbinder Tunick & Co. v. Manhattan National Life Insurance Co., 631 N.Y.S. 2d 148,
which bears no similarity whatsoever to the facts in the case at hand. In Buchbinder, plaintiff
had not expressed a deliberate intent to have the policy lapse; he merely had neglected to send in
a payment. Moreover, the notice that was sent to him was headed "Late Payment Offer."
Accordingly, the court found that "defendant's use of the word "OFFER" in the second notice
would lead a reasonable person to believe that there was an offer of an extension of the grace
period capable of acceptance by the insured." Buchbinder at 150.

_____

[2] The Policy contains no provision requiring that cancellation be in writing. *of the Policy*

In contrast, Mr. Wilson had given Northwestern Mutual's representative explicit directions to terminate his Term Life Policy and refund all premium payments past February 28, 2005. Moreover, the May 23, 2005 notice did not, like the document in Buchbinder, proclaim itself to be an "offer," but, rather, stated in unequivocal terms that "Your Insurance Service Account (IAS) Has Been Closed." Since there clearly was no offer, there was no obligation on Northwestern Mutual's part "to advise Mr. Wilson that the offer was rescinded" (Plaintiff's ~~Brief~~ Memorandum at page 30) and absolutely no basis for Mr. Wilson to have "reasonably believed that Northwestern was offering him the chance to keep the policy at his option." (Plaintiff's ~~Brief~~ Memorandum at page 31). Additionally, as explained in the February , 2008 Affidavit of Diane Knueppel, the refund of Mr. Wilson's premiums for the Term Life policy was conducted in two stages – first the future premiums for June through December ~~were~~ 2005 were refunded, and then the refund of the premiums for the past months of March, April and May 2005 were generated. At the conclusion of the first stage, the May 23, 2005 notice was automatically generated. This notice, however, became moot once the premiums for the three past months were refunded. Since that notice did premiums not constitute an "offer," and since Mr. Wilson obviously knew that he had requested a refund to of dueto February 28, 2005, there were no reasonable expectations created, and plaintiff's argument fails as a matter of law.

## CONCLUSION

Plaintiff has ~~not been able to~~ failed to establish that she is entitled to the proceeds of either the Whole Life Policy or the Term Life Policy. Therefore, for all the reasons stated herein, it is respectfully requested that this Court issue an Order denying defendant's motion for summary judgment and granting such other relief as it deems appropriate.

22

Dated:    Uniondale, New York
          February 28, 2008

                              Respectfully submitted,

                         By: _____
                              Norman L. Tolle, Esq.
                              RIVKIN RADLER LLP
                              926 RexCorp Plaza
                              Uniondale, New York 11556-0926
                              (516) 357-3242

                              Attorneys for Defendant
                              The Northwestern Mutual Life
                              Insurance Company

2123317 v1

23