UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------------------X

MICHELLE WILSON                                          Civil Action No. 07 CV 2790
                                                        (CLB)
                        Plaintiff,

            -against-

NORTHWESTERN MUTUAL INSURANCE COMPANY,

                        Defendant.

-----------------------------------------------------------------------------------X

**THE NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY'S**
**MEMORANDUM OF LAW IN OPPOSITION TO MICHELLE WILSON'S**
**MOTION FOR SUMMARY JUDGMENT**

RIVKIN RADLER LLP
926 RexCorp Plaza
Uniondale, New York 11556-0926
(516) 357-3000

Attorneys for Defendant
The Northwestern Mutual Life
Insurance Company

Of Counsel:
Norman L. Tolle

## PRELIMINARY STATEMENT

This Memorandum of Law is respectfully submitted in opposition to Michelle Wilson's ("plaintiff") motion for summary judgment in her action against The Northwestern Mutual Life Insurance Company (incorrectly named as Northwestern Mutual Insurance Company) (hereafter referred to as "Northwestern Mutual").

On or about May 29, 2004, Northwestern Mutual issued two life insurance policies to plaintiff's late husband, Kenneth Wilson ("Mr. Wilson"):  Whole Life Policy No. 16,852,083 in the face amount of $150,000 (the "Whole Life Policy") and Term Life Policy No. 16,852,105 in the face amount of $350,000 (the "Term Life Policy") (collectively the "Policies").  Both Policies lapsed as of February 28, 2005.

On or about June 6, 2005, Mr. Wilson died, and plaintiff subsequently demanded payment under the Policies.  Following Northwestern Mutual's denial of her claim, plaintiff initiated the instant action (the "Complaint") seeking the proceeds of the Policies and alleging untimely notification of denial, misleading and deceptive practices, violation of New York State's General Obligation Law and Insurance Law, and "negligence, carelessness and/or recklessness."  In accordance with the Order issued by Judge Charles L. Brieant, Northwestern Mutual moved on January 31, 2008 for summary judgment dismissing plaintiff's Complaint in its entirety, and plaintiff now moves for summary judgment "holding her entitled to payment of the Policies as a matter of law."  For the reasons detailed below, the Court should deny plaintiff's motion in its entirety.

**ARGUMENT**

**I.    PLAINTIFF'S MOTION IS PROCEDURALLY DEFECTIVE**

Federal Rule of Civil Procedure 56 provides that:

> A supporting or opposing affidavit must be made
> on personal knowledge, set out facts that would be
> admissible in evidence, and show that the affiant
> is competent to testify on the matters stated.  If a
> paper or part of a paper is referred to in an affidavit,
> a sworn or certified copy must be attached to or
> served with the affidavit.

F.R.C.P. 56(e).

The corresponding local civil rule for the Southern and Eastern Districts, Rule 56.1,

provides that:

> Upon any motion for summary judgment pursuant
> to Rule 56 of the Federal Rules of Civil Procedure,
> there shall be annexed to the notice of motion a
> separate, short and concise statement, in numbered
> paragraphs, of the material facts as to which the
> moving party contends there is no genuine issue
> to be tried.  **Failure to submit such a statement
> may constitute grounds for denial of the motion.**

Local Rule 56.1(a) (emphasis added). *See, also*, Aligheri v. Long Island Railroad et al., 1994

U.S. Dist. LEXIS 8769 at *11 (S.D.N.Y. June 29 (1994) ("The failure of the moving party to

submit a Rule 3(g)  [predecessor to rule 56.1] statement annexed to the notice of motion is thus

grounds for denial of the motion"); United States of America v. Pilot Petroleum Associates, Inc.,

1988 U.S. Dist. LEXIS 12344 at *2 (E.D.N.Y. Oct. 19, 1988)("The plain language of the rule

provides that the failure of the moving party to submit a Rule 3(g) statement is grounds for

denying the motion"). Plaintiff has failed to comport with this requirement.

The Second Circuit, in Laura Holtz v. Rockefeller & Co., Inc., 258 F. 3d 62, 73 (2d Cir.

2001)(internal citations omitted), explained that "[t]he purpose of Local Rule 56.1 is to

streamline the consideration of summary judgment motions by freeing district courts from the

need to hunt through voluminous records without guidance from the parties." Similarly the

district courts have repeatedly held that: "[t]he purpose of the Local 56.1 statement is to assist

the court in determining which facts are genuinely disputed" (Madison Maidens, Inc. v.

American Manufacturers Mutual Ins. Co., 2006 U.S. Dist. LEXIS 39633(S.D.N.Y. June 15,

2006) (internal citations omitted)) and that:

> Plaintiffs' failure to file a Statement of Undisputed Facts is not
> only a procedural error, but it is a substantive one as well.
> Without a Statement of Undisputed Facts and a response thereto,
> this Court cannot determine whether any material issues of fact
> exist, as required by Rule 56 of the Federal Rules of Civil Procedure.

Steinbach v. Brookman, et al., 2006 U. S. Dist. LEXIS 90327 (W.D.N.Y. Dec. 16, 2006)

(holding that plaintiffs had failed to satisfy their burden of demonstrating that there are no

material facts at issue). Thus, the Magistrate Judge, in Santiago v. Duarte et al., 2000 U.S. Dist.

LEXIS 2143 at * 5 (S.D.N.Y. Feb. 24, 2000), found that defendants' failure to comply with

Local Civil Rule 56.1 "constitutes grounds for denial of their motion" and recommended that the

motion be so denied, and the court in Harbor Seafood, Inc. v. June Foods Holding Corp., 1988

U.S. Dist. LEXIS 6518 (E.D.N.Y. May 24, 1988) denied plaintiff's motion for summary

judgment because it failed to submit the required statement of material facts.

     Furthermore, in those instances where the courts have elected to be flexible in construing

Rule 56.1, it was only because "other materials, such as affidavits, depositions and documentary

evidence, [had been] submitted in connection with the motion" (Koal Indus. Corp. v. Asland,

S.A. , 808 F. Supp. 1143, 1152 (S.D.N.Y. 1992) or because the plaintiff's counsel's affirmation

contained a detailed recitation of uncontested facts (Wasserman v. The City of New York, 802 F.

Supp. 849, 858 (E.D.N.Y. 1992) or because the moving party was acting *pro se* (Williams v.

Potter, 2007 U.S. Dist. LEXIS 60230 (S.D.N.Y. Aug. 14, 2007). In the case at hand, plaintiff

has failed to provide the required Rule 56.1 Statement of Material Facts, and none of the possible ameliorating factors cited above are present. Plaintiff is obviously not *pro se*, and her counsel's affirmation, consisting of only two paragraphs, does not serve to either admit any documents into the record or meet the requirements of F.R.C.P. 56 to "set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." Additionally, there are no other affidavits attached to the motion, and plaintiff's voluminous set of exhibits is not authenticated. Accordingly, this court should deny plaintiff's motion for failure to comply with the Federal and Local Rules, or, at a minimum, strike plaintiff's exhibits since they have not been properly authenticated or admitted.

In addition to her failure to comply with the Federal and Local Rules, plaintiff has also failed to comply with Judge Brieant's individual rules. The Individual Practices of Judge Charles L. Brieant at Paragraph 2, Section C states quite clearly that "[m]emoranda of law in support of and in opposition to motions should be limited to **25 pages**, and reply memoranda should be limited to 10 pages" (emphasis added). While Northwestern Mutual adhered to this requirement in its moving papers, plaintiff's "Memorandum of Law in Support of Fed. Rule 56(C) Motion for Summary Judgment" (hereafter referred to as "Plaintiff's Memorandum") ignored the requirement by exceeding the allowable page limit by nine pages.


## II.     PLAINTIFF'S MOTION IS SUBSTANTIVELY DEFECTIVE

Plaintiff's Memorandum states that plaintiff seeks "summary judgment holding her entitled to payment of the Policies as a matter of law pursuant to Fed. R. Civ. P 56 (c)." (Plaintiff's Memorandum at page 1.) On the basis of this statement, as well as plaintiff's failure to address any of the other causes of action alleged in her Amended Complaint (Exhibit

5 to Plaintiff's Memorandum), it must be assumed that plaintiff is seeking summary judgment

only on her breach of contract claim, and has chosen not to pursue any of her other causes of

action against Northwestern Mutual.  However, as will be demonstrated below, plaintiff is not

entitled to summary judgment granting her payment under the Policies because both Policies

lapsed more than three months prior to the insured's death.


### A.    The Whole Life Policy Terminated Effective February 28, 2005

Significantly, plaintiff only devotes two and one-half pages of her thirty-four page

Memorandum to argue that she is entitled to the proceeds of the Whole Life Policy.   Apparently,

even she realizes that her position in regard to this Policy is so meritless as to not warrant any

additional time or space.

Plaintiff does not dispute the fact that the Whole Life Policy terminated effective

February 28, 2005.  Instead, plaintiff's position with regard to the Whole Life Policy is based

upon her contention that the requirements of Insurance Law § 3211(a)(1) apply.  Insurance Law

§3211(a)(1) provides:

> No policy of life insurance or non-cancellable disability
> insurance delivered or issued for delivery in this state, and
> no life insurance certificate delivered or issued for delivery
> in this state by a fraternal benefit society, shall terminate or
> lapse by reason of default in payment of any premium,
> installment, or interest on any policy loan in less than one
> year after such default, unless a notice shall have been duly
> mailed at least fifteen and not more than forty-five days prior
> to the day when such payment becomes due. A separate notice
> shall not be required for insurance that is supplemental to a
> policy of life insurance.

5

However, as plaintiff acknowledges (see, Plaintiff's Memorandum at page 32), this notice requirement does not apply where premium payments are made on a monthly, or shorter, basis since Insurance Law § 3211 (f) explicitly states that: "[t]his section shall not apply to:

*** 

> (2) Any policy of insurance requiring the payment of premiums monthly or at shorter intervals, provided in the case of policies of life insurance the insurer issuing such policy elects with respect to all such policies to mail a written notice within six months after termination or lapse to the insured or to any other person who shall have been designated in writing to receive such notice, stating the type and amount of any automatic nonforfeiture benefit in force.

Plaintiff's convoluted contention is that, although Mr. Wilson had clearly elected to pay his premiums on a monthly basis (see ISA form, included as part of Exhibit "8" to Plaintiff's Motion, and annexed as Exhibit "L" to the January 25, 2008 Affidavit of Cylvia Prince, which was submitted with Northwestern Mutual's January 31, 2008 Motion for Summary Judgment), "it also appears that the actual payments were indeed billed by the company for payment on a quarterly basis," (Plaintiff's Memorandum at page 32), thereby triggering the notice requirements of § 3211(a)(1). However, in support of her claim that the payments were billed on a quarterly basis, plaintiff cites to only section 4.1 of the Whole Life Policy which reads:

> Premiums may be paid every 3, 6 or 12 months at the published rates of the Company. A change in premium frequency will take effect when the Company accepts a premium on a new frequency. Premiums may be paid on any other frequency approved by the Company.

Section 4.1 does not establish that Mr. Wilson paid his premiums quarterly. On the contrary, it clearly states that "[p]remiums may be paid on any other frequency approved by the Company" and the ISA form establishes that Northwestern Mutual approved a monthly payment frequency for Mr. Wilson. Plaintiff cites to no evidence that either Mr. Wilson or Northwestern

6

Mutual altered this monthly billing pattern.  Accordingly, there can be no question that the

§3211(f)(2) exception applies here.

The Appellate Courts in each department of New York State have held that where, as

here, the insured elected to make monthly premium payments, the § 3211(f)(2) exception

applies, and the insurer is not obligated to comply with the notice requirement of § 3211(a)(1).

See, McGarr v. The Guardian Life Insurance Company of America, et al., 19 A.D.3d 254, 256

(1st Department 2005)("since premiums were paid on a monthly basis, section 3211(a)(1) does

not apply…"); Gerold v. Companion Life Insurance Company, 819 N.Y.S. 2d 276, 278 (2d

Dep't 2006) ("the defendant was not required to notify the plaintiff that the policy lapsed

because the insured elected to pay the premiums on a monthly basis"); Elston v. Allstate Life

Insurance Company of New York (274 A.D. 2d 938, 939(3rd Dep't 2000) ("Once the monthly

automatic payment option for premiums was chosen, the language of Insurance Law § 3211 was

triggered, thus obviating the requirement that defendant provide written notification of

cancellation prior to its termination of the policy"); Reczek v. National Benefit Life Ins. Co., 20

A.D. 3d 887, 888 (4th Dep't 2005)("It is undisputed that decedent had elected to pay the

premiums on a monthly basis.  Having made that election, decedent thereafter was required to

make monthly payments and the notice requirement of section 3211(a)(1) was rendered

inapplicable").

All of the above cases involve fact patterns parallel to that in the case at hand.  In each,

the insured had elected to make monthly premium payments on his life insurance policy, the

policy lapsed for nonpayment, the grace period passed, the insured died, and the beneficiary or

executor then sued for the policy's proceeds, arguing that the insurer had failed to provide the

notice required by § 3211(a)(1).  In each case, the court found in favor of the insurer, holding

that §3211(a)(1) did not apply, that there were no triable issues, and that the insurer was not estopped from asserting the policy's lapse as of the premium due date.  In <u>Reczek</u>, the court additionally held that "[b]ecause no notice was required, the notice that was allegedly sent by defendant during the grace period was a 'gratuitous, 'friendly reminder '' that did not retroactively convert the policy to one requiring notice under section 3211 (a)(1) ." <u>Reczek</u> at 888 (quoting <u>Brecher v. Mutual Life Ins. Co. of N.Y.</u>, 120 A.D. 2d 423 (1986).

Here, as well, Mr. Wilson's election of the monthly payment option relieved Northwestern Mutual of the notice responsibilities of § 3211(a)(1).  Since Northwestern Mutual was not subject to the notice requirements of §3211(a)(1), plaintiff has no basis for claiming entitlement to the proceeds of the Whole Life Policy and her motion with respect to this Policy must be denied.

**B.    The Term Life Policy Terminated Effective February 28, 2005**

      1.    <u>There Was No Oral Agreement to Modify the Written Terms of the Term Life Policy.</u>

Plaintiff argues that she is entitled to the proceeds of the Term Life Policy because "the law [New York General Obligation Law § 15-301 and New York Insurance Law § 3204] does not allow-provide for the enforcement of oral modifications to the written terms of a life insurance policy" (Plaintiff's Memorandum at page 11).   While it is true that verbal agreements to change the written terms of a contract are generally impermissible, this argument has no relevance here because there were no oral modifications to the written terms of the Term Life Policy.  Although plaintiff alleges that there was "a claimed oral agreement with Mr. Wilson to modify the Policy terms related to the Policy's express grace period of 31 days…" and "an agreement for a change in premium due date" (Plaintiff's Memorandum at page 11), she fails to

show in what way(s) the Policy's terms relating to either the grace period or the premium due

dates were altered. Accordingly, there is no basis to plaintiff's argument and it must be rejected.

The provisions of the Term Life Policy which relate to the premium due date and the

grace period state as follows:

> 3.2    Premium Payment
> All premiums after the first are payable at the
> Home Office or to an authorized agent. A receipt
> signed by an officer of the Company will be furnished
> on request. A premium must be paid on or before its
> due date. The date when each premium is due and the
> number of years for which premiums are payable are
> described on page 3.
>
> 3.3    Frequency
> Premiums may be paid every 3, 6 or 12 months
> at the published rates of the Company. A change in
> premium frequency will take effect when the Company
> accepts a premium on a new frequency. Premiums may
> be paid on any other frequency approved by the
> Company.
>
> 3.4    Grace Period
> A grace period of 31 days will be allowed to
> pay a premium that is not paid on its due date. The
> policy will be in full force during this period. If the
> insured dies during the grace period, any overdue
> premium will be paid from the proceeds of the policy.
>
> **If the premium is not paid within the grace
> period, the policy will terminate as of the due date**.
> (emphasis added)

On May 23, 2005, Mr. Wilson telephoned Northwestern Mutual to inquire why there

was a $35 shortage in his ISA (Insurance Service Account), the account through which the

Policies' premiums were paid. When it was explained to him that he had incurred a $35 charge

since his earlier termination of the Whole Life Policy meant that he no longer owned multiple

Northwestern Mutual polices, Mr. Wilson requested that the Term Life Policy premium payment

he had made for the ten-month period covering March through December 2005 be refunded, and that the Policy be allowed to lapse. (See January 22, 2008 Affidavit of Diane Knueppel and its exhibits, submitted with Northwestern Mutual's January 31, 2008 Motion for Summary Judgment). As the result of Northwestern Mutual's compliance with this request, the last paid premium for the Term Policy was for the period ending February 28, 2005. Therefore, as per the Policy provisions, the 31-day grace period expired March 31, 2005 and the Term Life Policy lapsed as of February 28, 2005. This transaction involved neither a "change in premium due date" nor a modification of the "grace period of 31 days" and therefore did not violate either the General Obligation Law or the Insurance Law.[1]

> 2. Northwestern Mutual's Business Records Constitute Admissible, Authenticated Evidence that Mr. Wilson Elected to Terminate the Term Life Policy

Although plaintiff acknowledges that Federal Rule of Evidence ("FRE") 803(6) permits the admission of business records under certain specified conditions, she contends that Northwestern Mutual's July 26, 2005 letter is not admissible because it "was not made in the regular course of business at or about the time of the event and by a person with personal knowledge." (Plaintiff's Memorandum at page 20). Northwestern Mutual has, however, never indicated that it intended to introduce its July 26, 2005 letter as a business record. Nevertheless, plaintiff then attempts to piggyback the identical argument as a means of discrediting, across the board, all of Northwestern Mutual's Discovery Responses. In this regard, however, her argument must fail as a matter of law since many of the Discovery Responses, specifically those

---

[1] Since plaintiff's Complaint alleges violation only of General Obligation Law § 15-301 and Insurance Law § 4226, the arguments she makes in her motion papers relating to Insurance Law § 3204 and General Obligations Law §5-701 must be disregarded by the Court.

10

documents which Northwestern Mutual does seek to admit as evidence, indeed meet the requirements of FRE 803(6).

In interpreting FRE 803(6), the Second Circuit has consistently held that "Rule 803(6) 'favors the admission of evidence rather than its exclusion if it has any probative value at all,' In re Ollag Constr. Equip. Corp., 665 F.2d 43, 46 (2d Cir. 1981) (quotation omitted), and the 'principal precondition' to admissibility 'is that the record[] [has] sufficient indicia of trustworthiness to be considered reliable.' Saks Int'l v. M/V "EXPORT CHAMPION, 817 F.2d 1011, 1013 (2d Cir. 1987)" Phoenix Assocs. III v. Stone, 60 F.3d 95, 101 (2d Cir. 1995). Similarly, with respect to the requirements set out in Federal Rule of Evidence 901(a) for the authentication of records, the Second Circuit has also observed that "Rule 901 does not erect a particularly high hurdle, and the proponent of the evidence is not required to rule out all possibilities inconsistent with authenticity, or prove beyond any doubt that the evidence is what it purports to be."(United States v. Dhinsa, 243 F. 3d 635, 658 (2d Cir. 2001) (internal citations omitted)); and that "Rule 901's requirements are satisfied if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification". United States v. Tin Yat Chin, 371 F. 3d 31, 38 (2d Cir. 2004)(internal citations omitted)

Searles v. First Fortis Life Ins. Co., 98 F. Supp. 2d 456 (S.D.N.Y. 2000), is directly on point. In Searles, Wendy Wagoner, a benefits specialist for Fortis, stated in her affidavit that she had personal knowledge of the facts relating to plaintiff's claim for disability benefits because she had personally investigated and evaluated that claim and had reviewed the related administrative records. The Court found Ms. Wagoner competent to testify and to introduce the relevant documents into the record, and held that her testimony did not contain inadmissible hearsay. Because "each statement in her affidavit that references conversations with others is

11

supported by citations to the administrative record, in which Ms. Wagoner documented her various conversations in what appears to have been the course of Fortis' regular business practice," the Court held that "[s]uch statements are therefore admissible under the business records exception to the hearsay rule and, as the custodian of the records, Ms. Wagoner is a competent witness through whom they could be admitted at trial." Id. at 462.

In other Second Circuit cases, the courts have held that the case notes made by a social worker in the regular course of business were admissible under the business records exception to the hearsay rule (Malek v. Federal Ins. Co., 994 F. 2d 49, 53 (2d. Cir. 1993)), as were medical records that were on the medical corporation's letterhead and contained notes which appeared to have been written by the corporation's medical director and physician (Kamara v. United States, 2005 U.S. Dist. LEXIS 20651 (S.D.N.Y. Sept. 20, 2005). Although decided under State Law, the case of Trotti et al. v. Estate of Lynn P. Buchanan, 272 A.D. 2d 660 (3rd Dep't 2000) is especially instructive here since the defendants attempted to invoke the protection of the Dead Man's Statute in connection with the introduction of business records. The defendants claimed that plaintiff's son could not authenticate the business receipts documenting the decedent's debts to his mother's store because he was an 'interested" person. The court, however, held that he could not "be said to be a 'person interested in the event,'" and it, therefore, accepted his testimony that these records were kept "regularly, systematically, routinely and contemporaneously." Id at 661. The court additionally held that the store owner's own "testimony concerning the authentication of her business records consisted of her description of the manner and method of recording store credit transactions, an independent act which cannot be considered testimony 'concerning a personal transaction or communication' with decedent." Id at 662 (internal citations omitted).

In a similar manner, the records made by Northwestern Mutual employees memorializing and documenting their telephone conversations and other interactions with Mr. Wilson, Mr. Stein and each other are indisputably admissible under the business records exception to the federal hearsay rules, and the affidavits of those individuals are sufficient to establish the records' authenticity. Thus, the May 23, 2005 telephone conversations between Mr. Wilson and Diane Knueppel, a Senior Customer Service Representative at the time, in which Mr. Wilson instructed Ms. Knueppel to refund the last draft for the Term Life Policy and let the Term Life Policy lapse as of February 28, 2005, are admissible since, as plaintiff herself explains, they were memorialized, in accordance with Northwestern Mutual's usual business practice, on Northwestern Mutual's Casetracker system "at or about the time of the event and by a person with personal knowledge." (Plaintiff's Memorandum at page 20). See, January 22, 2008 Affidavit of Diane Knueppel and its accompanying exhibits. Similarly, the notes of Ms. Knueppel's conversation with Mr. Stein, her request to Joyce Barrack (a Senior Analyst in Northwestern Mutual's Policyowner Services Department) to "refund premiums back to Feb 2005," and her notes regarding "refund sent via SAMS to client for premiums paid back to Feb 2005" (Id.) are likewise admissible since they too were documented, as per Northwestern Mutual's usual business practice "at or about the time of the event and by a person with personal knowledge." Also admissible are the notes made on the Casetracker System by Ms. Barrack (see January 24, 2008 Affidavit of Joyce Barrack, submitted with Northwestern Mutual's January 31, 2008 Motion for Summary Judgment), and the documents generated from Northwestern Mutual's financial history records by Cylvia Prince, a Northwestern Mutual Research Specialist (see January 25, 2008 Affidavit of Cylvia Prince).

Moreover, plaintiff, in her transparent effort to have Northwestern Mutual's discovery responses rejected, makes several blatant misrepresentations. For example, in an attempt to insinuate that Mr. Wilson did not know of the $35 fee prior to his death, and therefore could not have made the telephone call documented in Northwestern Mutual's records, plaintiff states that "[a]ccording to the notes, the shortage should not have been 'charged until the policy lapsed, after May 29, 2005. [See Exhibit "NML 274.]" See, Plaintiff's Memorandum at page 21. Although plaintiff includes opening quote marks in her alleged quotation, she omits closing quote marks, thereby giving the impression that the quotation included the date, May 29, 2005. However, a review of the cited document shows that, in reality, the note entered on Northwestern Mutual's Casetracker system read:

> "Spoke with client, informed him that the $35 is a policy fee that was previously waived due to the companion status on this policy. Once his ACL [the Whole Life] policy lapsed this policy [the Term Life Policy] is no longer a companion policy so the fee is no longer waived. Client indicated that the amount quoted to pay the ISA to December included this fee. Explained that the **fee would not have charged until the policy [the Whole Life Policy] lapsed**, therefore the amount quoted to reactivate the ISA did not include the policy fee.
> Client is now asking to be refund[ed] his last payment and let the policy lapse. Negotiated call back so I may contact FR [Field Representative Daniel Stein] to discuss."

NML 274 and NML 144 (copy annexed as Exhibit "B" to the January 22, 2008 Affidavit of Diane Knueppel)

Accordingly, despite plaintiff's efforts to play fast and loose with the facts, it is clear that the $35 fee was generated after the Whole Life Policy terminated, and that the May 29, 2005 date was not part of the Casetracker note. Moreover, Northwestern Mutual's business records document that the premium adjustment of $35 was made on May 9, 2005, resulting in the negative balance that precipitated Mr. Wilson's May 23, 2005 telephone call. See January 25, 2008 Affidavit of Cylvia Prince at ¶ 24 and the accompanying exhibit. Since more than two

weeks passed between the generation of the negative balance and Mr. Wilson's telephone call, he had more than enough time to learn of the shortage, and plaintiff's attempts to paint a different picture must fail. Finally, plaintiff's contention that the "Northwestern representative who it is claimed had the conversation with Mr. Wilson is surprised that a shortage existed in his ISA Account," (Plaintiff's Memorandum at page 21) is not supported by the record (see NML 274/144 annexed as Exhibit "B" to the January 22, 2008 Affidavit of Diane Knueppel), and, in fact, is a complete fiction.

Plaintiff also misleads the court by stating that "[a]fter the conclusion of Discovery Defendant's Counsel provided form 18-1680 (2004), a form used for policy cancellation, together with the admission that the form was not provided to Mr. Wilson as was the usual practice of Northwestern" and she cites to her Exhibit 12. (Plaintiff's Memorandum at page 3) However, even a cursory glance at plaintiff's Exhibit 12 reveals that plaintiff has not only omitted the second page of Northwestern Mutual's counsel's December 19, 2007 letter, but has also completely misrepresented the contents of the letter. Contrary to her assertion, the letter contains no "admission," but, rather explains quite explicitly that the form "would not have been used with respect to Mr. Wilson's request to terminate his term life insurance policy, since he not only requested a cancellation of the policy, but also requested a refund of premiums effective some three months earlier than the date he requested cancellation. ***Therefore, the enclosed policy form*** which provides that cancellation will be effective at the end of the insurance period for which premiums have been paid, unless an earlier date is required by contractual terms or state regulation, ***is not applicable to Mr. Wilson's situation***." (emphasis added). See Plaintiff's Exhibit 12.

15

Accordingly, despite plaintiff's deliberate efforts to obfuscate the record, it is clear that Northwestern Mutual's business records meet the requirements of the Federal Rules of Evidence, and are admissible to establish that Mr. Wilson requested that Northwestern Mutual terminate the Term Life Policy effective February 28, 2005.

### 3. The "Dead Man's Statute" Does Not Preclude Testimony Regarding Conversations between Northwestern Mutual employees and Mr. Wilson

Although FRE 601 generally governs the competency of potential witnesses in federal cases, New York C.P.L.R. § 4519 (the so called "Dead Man's Statute") must be applied here because FRE 601 provides that: "[i]n civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the competency of a witness shall be determined in accordance with State Law." Sun Life Assur. Co. v. Deborah Ann Gruber, 2007 U.S. Dist. LEXIS 92141 at *47, n. 56 (S.D.N.Y. Dec. 14, 2007) (*citing* Rosenfeld v. Basquiat, 78 F. 3d 84, 88 (2d Cir. 1996) and H. R. Rep. No. 650, 93rd Cong., 1st. Sess. 9 (1973) (noting that FRE 601 was amended to require the application of state competency rules to avoid "rendering inapplicable in the federal courts the so-called Dead Man's statutes").

"CPLR 4519 disqualifies parties interested in litigation from testifying about personal transactions or communications with deceased or mentally ill persons" (Poslock v. Teachers' Retirement Bd., 88 N.Y. 2d 146, 150 (N.Y. 1996) (*citing* **Prince, Richardson on Evidenc**e § 6-121) in order to "'protect the estate of the deceased from claims of the living who, through their own perjury, could make factual assertions which the decedent could not refute in court'" (Poslock, *quoting* Matter of Wood, 52 NY2d 139, 144 (1981)).  However, not only is the operable term "parties **interested** in litigation," but a number of exceptions to this rule have also been carved out by the courts of New York.

There has been considerable controversy surrounding the "Dead Man's Statutes" enacted by many states, and a large body of case law analyzing and interpreting such statutes has evolved. For the purposes of the matter at hand, the most important New York ruling is that by the Court of Appeals in <u>Ward v. New York Life Ins. Co.</u>, 225 NY 314 (N.Y. 1919) which created an exception for testimony relating to life insurance policies. As pointed out by the Court of Appeals in 1996, "Ward itself, decided in 1919, has stood the test of time, common-law developments and legislative change... " <u>Poslock</u>, *supra,* at 152.

> In *Ward,* this Court narrowly bypassed the predecessor statutory prohibition (*see,* former Code Civ Pro § 829). The linchpin of the Court's holding was the language in former Code of Civil Procedure § 829 (now CPLR § 4519), that the statute only applied when the persons against whom the testimony was being offered "derived their 'title or interest from, through or under a deceased person' " ( *Ward v New York Life Ins. Co., supra,* at 319, quoting former Code Civ Pro § 829). To solve the dilemma there, the Court examined the nature of those life insurance proceeds. It determined that they did not come "from, through or under" the deceased person, because "[t]he great body of authority makes it plain … that when section 829 speaks of deriving title or interest from, through or under a deceased person it contemplates property or an interest *which belonged to the deceased in his lifetime* and the title to which has passed by assignment or otherwise through him to the party who is protected by the section" ( *id.,* at 319-320 [emphasis added]). The proceeds of a life insurance policy, the Court declared, "never belonged to the deceased and … did not come into existence until his death" ( *id.,* at 320).

<u>Poslock</u> at 151-152. *See, also,* 81 **Am. Jur**. 2d Witnesses § 658 ("The beneficiary in a life insurance policy or benefit certificate is not protected by a dead man's statute when sued by one seeking to recover the proceeds or impress a trust upon them, or when made a party to an interpleader action by the insurer or benefit society, as no right of the deceased passed to the beneficiary and any interest he or she may have came into existence upon the death of the insured as an original obligation").

As a result of thus interpreting the Dead Man's Statute, the Court of Appeals in <u>Ward</u>

17

held that the wife's testimony concerning her deceased husband's change of life insurance beneficiary should have been admissible in the interpleader action commenced by the insurance company. Similarly, the Southern District, in New York Life Ins. Co. v. Cross, 7 F. Supp. 130, 131 (S.D.N.Y. 1934), relying on Ward, held that "under the construction of section 347 of the Civil Practice Act by the New York Court of Appeals, which, of course, controls me, on the competency of witnesses the testimony [of one of three claimants to the proceeds of a life insurance policy] is admissible, for the reason that under the decision in that case the other respondents are not persons who derived their title or interest "from, through or under a deceased person * * * by assignment or otherwise.").

Thus, the Court of Appeal's decision in Ward is a binding "exception to the general statutory principle" (Poslock at 152) which indisputably allows the admission of testimony by Northwestern Mutual employees in which they relate their conversations with Mr. Wilson. However, even without the Ward exception, the Dead Man's Statute would not apply here because an insurance company employee is clearly not "a person interested in the event."

The following standard has been set forth by the courts for evaluating whether a potential witness is "interested" for purposes of invoking the Dead Man's Statute:

> The true test of the interest of a witness is that he will either gain or lose by the direct legal operation and effect of the judgment, or that the record will be legal evidence for or against him in some other action. It must be a present, certain and vested interest, and not an interest uncertain, remote or contingent.

In re Estate of Rosenblum, 284 A.D.2d 820, 821 (3rd Dep't 2001), appeal denied, 97 N.Y.2d 604 (2001) (quoting Friedrich v. Martin, 294 N.Y. 588, 595 (N.Y. 1945) quoting 1 Greenleaf on Evidence, section 390.)). See also, Stay v. Horvath, 177 A.D.2d 897, 899 (3rd Dep't 1991) (internal citations omitted) ("We note initially that the party claiming that a witness is a person

18

"interested in the event" (CPLR 4519) carries the burden of proving that the witness's testimony

is subject to this statutory exclusion"); Duncan v. Clarke, 308 N.Y. 282, 285 (N.Y. 1955) ("the

'interest' which renders a witness incompetent under section 347 [now 4519] is only such as

results from the 'direct legal operation of the judgment'"); Croker v. New York Trust Co., 245

N.Y. 17, 22 (N.Y. 1927) (quoting Albany Co. Sav. Bank v. McCarty, 149 N. Y. 71, 84 (1896))

("An interest in the question is not enough to disqualify as that is not an interest in the event.

'Unless the witness will gain or lose by the event, either directly, as in money, or indirectly,

because the record could be used as evidence for or against him, he is not disqualified.' A

witness might be biased. He might be solicitous for the success of the party for whom he testified

or he might feel a deep interest in the result of a trial. His credibility might be thereby affected

but he was not disqualified for interest.")

Thus, for instance, the court in Stay v. Horvath, supra, held that, with regard to a witness

who had a money judgment against the plaintiff, "[i]nasmuch as defendants have not proved that

Morrell's interest is "'present, certain, and vested' " as opposed to " 'uncertain, remote or

contingent' " (Friedrich v Martin, supra, at 595), it was error to exclude his testimony as to any

transaction or communication with Sturges (see, Croker v. New York Trust Co., 245 NY 17,

22)" Id. at 899.  Similarly, in Trotti et al v. Estate of Lynn P. Buchanan, supra, the court held

that testimony by the son of the store owner to whom the deceased was indebted did not violate

CPLR § 4519, and in Matter of Stacer v Newman et al., 13 A.d. 2d 164 (4th Dep't 1961 (quoting

Matter of Behan, 159 Misc. 337, 339 Surr. Ct. Kings Cty 1936), the attorney who was named as

executor in one of the wills executed by the deceased was allowed to testify on the basis that "'a

testamentary fiduciary has no such interest in the event, by reason of a prospective potential right

to commissions, as to render him an incompetent witness under section 347 of the Civil Practice

Act.'"  Along similar lines, the Surrogates Court of Orleans County allowed a wife to testify concerning a multi-million dollar transaction between the deceased and her husband although she clearly had a potential financial interest in the outcome of the case.  In re Freeman's Will, 23 Misc. 2d 846 (Sur. Ct. Orleans Cty 1960).

The Northwestern Mutual employee who spoke to Mr. Wilson clearly will neither gain nor lose personally by the outcome of this case, and therefore cannot be deemed to have an interest in the outcome of this litigation "present, certain, and vested" such that her testimony would be barred by the Dead Man's Statute.  As demonstrated by the cases cited above, since the courts have permitted individuals with significantly more direct interest in the outcome of their respective cases to testify, there is no absolutely no basis for invoking the Dead Man's statute here.  Accordingly, Ms. Knueppel's testimony concerning her conversations with Mr. Wilson must be admitted.

4.  <u>Neither Mr. Wilson's Failure to Deposit the Refund Check Nor The Mailing of Northwestern Mutual's May 23, 2005 Notice Serve to Refute the Fact That the Term Life Policy Terminated Effective February 28, 2005</u>

As a last-ditch effort to salvage her case, Points IV and V of Plaintiff's Memorandum present a series of rambling contract law arguments that are neither relevant nor appropriate to the instant case, and which do not alter the indisputable fact that the Term Life Policy terminated, at Mr. Wilson's direct request, effective February 28, 2005.

Plaintiff contends that plaintiff's failure to deposit the second refund check serves to revoke Northwestern Mutual's "offer to backdate and terminate-cancel the Policy."  This argument simply has no basis in either fact or law.  First, Northwestern Mutual did not make an "offer" to plaintiff; rather it was plaintiff who initiated the telephone call and made a request to

Northwestern Mutual. Secondly, the telephone conversation between Ms. Knueppel and Mr.

Wilson was not a negotiation to enter into a contract; rather it was a request to terminate the

existing contract between the parties. As such, it did not need to be in writing[2] and no

consideration was required. Thus, neither the cited treatises nor the cited cases have any

applicability, and this argument must be rejected.

Similarly without merit is plaintiff's argument that Northwestern Mutual's May 23, 2005

notice "must be considered an extension-offering to exercise Mr. Wilson's option to keep the

policy." (Plaintiff's Memorandum at page 29).   In support of her contention that "[n]otices

relative to the terms-offerings of a policy are considered an extension of the policy…," plaintiff

cites to a single case, Buchbinder Tunick & Co. v. Manhattan National Life Insurance Co., 631

N.Y.S. 2d 148, which bears no similarity whatsoever to the facts in the case at hand.  In

Buchbinder, plaintiff had not expressed a deliberate intent to have the policy lapse; he merely

had neglected to send in a payment.  Moreover, the notice that was sent to him was headed "Late

Payment Offer."  Accordingly, the court found that "defendant's use of the word "OFFER" in the

second notice would lead a reasonable person to believe that there was an offer of an extension

of the grace period capable of acceptance by the insured." Buchbinder at 150.

In contrast, Mr. Wilson had given Northwestern Mutual's representative explicit

directions to terminate his Term Life Policy and refund all premium payments past February 28,

2005.  Moreover, the May 23, 2005 notice did not, like the document in Buchbinder, proclaim

itself to be an "offer," but, rather, stated in unequivocal terms that "Your Insurance Service

Account (IAS) Has Been Closed." Since there clearly was no offer, there was no obligation on

Northwestern Mutual's part "to advise Mr. Wilson that the offer was rescinded" (Plaintiff's

Memorandum at page 30) and absolutely no basis for Mr. Wilson to have "reasonably believed

---

[2] The Policy contains no provision requiring that cancellation of the Policy be in writing.

that Northwestern was offering him the chance to keep the policy at his option." (Plaintiff's Memorandum at page 31). Additionally, as explained in the February 26, 2008 Affidavit of Diane Knueppel, the refund of Mr. Wilson's premiums for the Term Life policy was conducted in two stages – first the future premiums for June through December 2005 were refunded, and then the refund of the premiums for the past months of March, April and May 2005 were generated. At the conclusion of the first stage, the May 23, 2005 notice was automatically generated. This notice, however, became moot once the premiums for the three past months were refunded. Since that notice did not constitute an "offer," and since Mr. Wilson obviously knew that he had requested a refund of the premiums to February 28, 2005, there were no reasonable expectations created, and plaintiff's argument fails as a matter of law.

## CONCLUSION

Plaintiff has failed to establish that she is entitled to the proceeds of either the Whole Life Policy or the Term Life Policy. Therefore, for all the reasons stated herein, it is respectfully requested that this Court issue an Order denying defendant's motion for summary judgment and granting such other relief as it deems appropriate.

Dated:    Uniondale, New York
          February 28, 2008

Respectfully submitted,

By:   _Norman Tolle_

Norman L. Tolle, Esq.
RIVKIN RADLER LLP
926 RexCorp Plaza
Uniondale, New York 11556-0926
(516) 357-3242
Attorneys for Defendant
The Northwestern Mutual Life
Insurance Company

22

## AFFIDAVIT OF SERVICE

STATE OF NEW YORK        )
                              ) SS. :
COUNTY OF NASSAU      )

       I, Lisa Sullo being sworn, say:

       I am not a party to the action, am over 18 years of age and reside in West Babylon, New York.

       On February 29, 2008, I served the within **The Northwestern Mutual Life Insurance Company's Memorandum of Law in Opposition to Michelle Wilson's Motion for Summary Judgment** by depositing a true copy thereof enclosed in a post-paid wrapper, in an official depository under the exclusive care and custody of the U.S. Postal Service within New York State, addressed to each of the following persons at the last known address set forth after each name:

       Douglas R. Dollinger & Associates
       40 Matthews Street, Suite 101
       Village of Goshen
       Goshen, New York  10924

                                     _Lisa Sullo_
                                       Lisa Sullo

Sworn to before me this
29th day of February, 2008

_____
Notary Public

                     DIANA DORSEY
           Notary Public, State of New York
                 No. 01DO6067959
              Qualified in Nassau County
        Commission Expires December 24, 20 __